Hudson County Court of Common Pleas.

GEORGE DORIAN, PETITIONER-APPELLEE, v. FEDERAL SHIPBUILDING AND DRY DOCK COMPANY, RESPONDENT-APPELLANT.

Decided April 7, 1947.

For the petitioner-appellee, *Isaac W. Seiler* (*Aaron Gordon,* of counsel).

For the respondent-appellant, *Stryker, Tams & Horner* (*Andrew Lawrie,* of counsel).

DREWEN, C. P. J. The petitioner was an employee of respondent company at its Kearny shipyard. He is now totally and permanently disabled by a hemiplegia, or "cerebral lesion" as the medical experts state it. The accident alleged to have resulted in this condition occurred, it is claimed, on January 17th, 1944. The original claim petition was not filed until March 26th, 1945, and it describes the accident in these words: "I was knocked down by the crowd of the day crew which was going off duty as I was going on. My right hand was badly cut and bruised and I was severely shocked and was confined to St. Francis Hospital until April 10th, 1944." In the claim petition permanent injury is alleged to have resulted as follows: "My nervous system has been completely shattered; my right hand has been permanently injured. I have lost my power of speech."

The character and extent of the disability are not in dispute. The single question to be determined is that of causal relation between petitioner's present state and the accident alleged. The only testimony of the accidental happening is that of petitioner himself. There is no direct evidence that anyone else saw it. The narration of the accident and the sequel as he gives it is as follows: He was knocked down, he says, sustaining a bruise in the bone of the right shin and on the arm, also a cut on the back of the hand; and his "head was injured." When he was knocked down he stayed there a minute or two, then "some other fellows" helped him get up. While on the ground he "didn't feel very good * * * the eye and the head were injured * * *." While down for a minute or two he was dazed; when helped up he "stood there for a little while * * * was nervous * * * then went to the shop." From there he went to his foreman to get a ticket to the first aid. At the first aid station he saw a nurse and says he "told her that I had a hand injury and the head injury." At the first aid station, he says, "they just fixed up my hand * * * they gave me a card to get me flash glasses." On leaving the first aid station he went back to work and remained at work throughout his regular time, plus four hours of overtime. That night he felt "very funny." The head and the hand and the leg hurt him. When he-

touched his eye, the right one, it hurt. It was swollen, and there were two big bruises on the right shin. And the right hand was cut on the side of it. His head was "bruised, swelled." The swelling was on the right side of the forehead, just above the right eye. There was nothing else that gave him any trouble that night. That night his head hurt him all over, but the bruise was just across the eyebrow. After completing his overtime work on the morning of January 18th he went directly by bus, tube and subway to his home in Brooklyn, reaching there about 5:30 A. M. He went promptly to bed and upon retiring felt bad all over, his head, arm and leg. He arose at 12 noon on the 18th. He left his home in time to report for work on his regular shift from 4 P. M. to 12 midnight. His right arm was bothering him. It hurt him. When he boarded the bus in Jersey City for the last stage of his trip to the shipyard, he "got the feeling in my arm;" he could not move it one way or the other. This occurred between the time he boarded the bus in Jersey City and the time he left it at the shipyard in Kearny. Upon arriving at his work place in the yard someone took him to the first aid station, whence he was removed, after a time, to St. Francis Hospital. He remained in the hospital for about three months, until April 10th. Thus does petitioner describe the accident, the injury and its sequel. As to the accident, there is no testimony but his own, unless we add that of his wife regarding her having seen a lump over petitioner's right eye upon his return home, and to which further reference shall presently be made.

The issue here centers in the question whether the injury inflicted by the fall included an injury or trauma to the head. Petitioner's wife testifies that upon her husband's return from work in the early morning of January 18th his hand was bandaged and that she noticed also a swelling over the right eye. In another place she describes it as "just a bump." She adds that there was no cut, no discoloration, no evidence of treatment. She gives the proportions of the bump or swelling as about one-half inch in length and one-quarter inch high. When she saw her husband at the hospital on the morning of January 19th she did not notice the bump.

As already indicated, this testimony of the wife, together with that of petitioner, is all that the record tells of the accident itself. It is the uncontradicted medical proof in the case that an evidence of trauma like that just described would develop within one hour after a blow sufficient to cause it and would remain six or seven days.

It so happens that the medical controversy on the vital question of causal relation between the disability and the accident is resolved into the simple issue of fact as to whether the petitioner's fall did actually include a head trauma, or anything more than the abrasion on the back of the hand. This simplification comes about in the manner following. The medical experts called by petitioner testified to causal relationship upon a strict hypothesis that included the assumption of traumatic injury to the head, while the medical experts called by respondent testified to the absence of such relationship upon a hypothesis that excluded such injury. The former experts, however, upon being finally required to state their opinion upon a contrary hypothesis, that is one excluding an assumption of head trauma, declared that upon that basis they could find no causal relation between the claimed accident and the disability; and the experts called by respondent expressed the opposite reversal of opinion upon a corresponding change in the hypothesis submitted to them. Thus it is that all controversy centers in the presence or absence of head trauma, one result of this being that without head trauma there can be no causal relation, in the agreed opinion of the doctors. It must be apparent, however, that even without this ultimate explicit medical assent, the inflicting of head trauma must still be regarded as the major question, for the reason that the expert opinion of causal relation rested throughout upon an assumption of that factor, just as the contrary opinion rested upon its omission.

It is respondent's contention in this respect that there was no head trauma, and that all averments of that kind now made are entirely the result of afterthought. Respondent contends that, notwithstanding the testimony of petitioner and such corroboration as his wife may be said to afford, the instances of petitioner's failure to report any injury to his

head on occasions when he was required to describe the accident and to state such injury had there been one, plus the instances of the failure of disinterested persons to observe on petitioner's head or face any external evidence of trauma, even under such circumstances that they would quite certainly have done so had the evidence been present, are so numerous and consistent as to establish preponderating proof against the claim.

From the determination and finding of fact below we learn that the deputy commissioner, having found this "to be a very difficult case to decide, * * * concluded to give the benefit of the doubt in favor of the petitioner and make an award." What the doubt was or upon what appraisals of proof it was resolved does not appear, except only in so far as it is said that the Bureau had before it "the positive testimony of petitioner, corroborated by his wife, of the trauma, while the proof of the respondent was negative, namely, that no evidence of injury to the head was found and that no history was noted." Defensive proof cannot be rightly dismissed because it is negative. The normal, ordinary thesis of defense in cases of every kind is negative, and while proof may be negative in form its cogency and consequence may well be clearly positive. Whether petitioner's burden is expressed as the greater weight of the credible evidence or as a preponderance of probabilities, the result is the same in that it remains for him to establish the prevailing proof. On which side is the preponderating proof here to be found? The problem is that of weighing evidence by a determination of the credible and the probable. The task is to search out the dynamics of the proof and rest the decision where they carry it. If the process appears too meticulous and overlong, it is so out of deference to grievous matter.

The principle by which in the main the test must be made is set forth in *Wigmore* (3d ed.), § 1042, as follows:

"A failure to assert a fact when it would have been natural to assert it amounts in effect to an assertion of the nonexistence of the fact. This is conceded as a general principle of evidence. There may be explanations indicating that the person had in truth no belief of that tenor, but the conduct

is *prima facie* an inconsistency. There are several common classes of cases:

"(1) Omissions in legal proceedings to assert what would naturally have been asserted under the circumstances;

"(2) Omissions to assert anything or to speak with such detail or positiveness, when formerly (previously) narrating, on the stand or elsewhere, the matter now dealt with."

Numerous authorities that support this text present a wide variety of instances in which the principle is shown to have been applied; among them is the case of *State* v. *Rosa,* 71 *N. J. L.* 316; 58 *Atl. Rep.* 1010. In the latter case one who had testified in a former trial wherein the same or similar facts were at issue was confronted with his failure to state in his testimony on the prior occasion certain relevant details which he included in his testimony on the later occasion. The witness attempted to explain the omission by saying that he forgot to tell, and that on the prior occasion he had not been questioned on the point. Mr. Justice Dixon said for the Court of Errors and Appeals: "The circumstances of the case render it probable that this same scene was the subject of the former examination, and his declaration that when previously testifying he forgot to tell about it implies that there was a proper opportunity for telling it if it had been present in his mind."

The principle of law thus exemplified is clearly applicable here, and it falls within both of the classifications that Wigmore presents. In the first of these is the failure of petitioner to include a head injury in the filed compensation claim, and in the second is the failure to tell of a head injury to the doctors, the nurse or to the foreman, Simonetti, when there was every reason and complete occasion for his doing so. Supplementing these omissions is the evidence adduced by respondent of the observed non-existence of the lump on petitioner's forehead spoken of in the testimony of petitioner's wife.

The person who first saw petitioner immediately following the claimed accident on January 17th is the witness Anna M. Garley, a nurse. At the time of the hearing she had had twelve years' experience as a registered nurse and had been

employed in that capacity at respondent's plant, though at the time of the hearing she had been out of respondent's employment for a considerable period. The card record of her interview with petitioner is in her handwriting. She had it before her while testifying. In response to her inquiry for the nature and cause of his trouble petitioner stated to Miss Garley "I slipped and fell, striking my right hand." The nurse found an abrasion on the back of the right hand and the right third finger, and of which she made notation. She says he did not tell her of any injury to his head and that she saw no evidence of such injury. She cleansed the wounds on petitioner's hand and applied dressings thereto. On the same visit to the nurse petitioner told her also of a welding flash experience during the prior evening and which necessitated treatment for irritation of the eyes. The nurse examined petitioner's eyes and observed a welding flash irritation in both, a common occurrence in shipyards of which the witness had treated many cases. In the course of her examination of petitioner's eyes she noticed nothing abnormal about his forehead or face. A note was written on the card by the witness calling for flash glasses for petitioner. Three times in all during the same evening petitioner, pursuant to the nurse's direction, called on her for the administration of eye drops. On none of these occasions was any evidence of trauma or injury to the head noticed, nor was there any complaint thereof. Witness did not recall that petitioner said anything about his head hurting, nor about headaches, nor dizziness, nor nausea, nor that he gave any history that he was unconscious or dazed at the time of the injury to his hand. At no time did the witness see anything to indicate a swelling on the forehead over the right eye, or elsewhere. Her testimony is that if she had seen a swelling, or more specifically one of the kind described by petitioner's wife, it would have been of importance to her. She would have written it in her findings as recorded, and had there been such a swelling the witness would have referred petitioner to the plant doctor at once. The placing of flash drops in the eye required that witness look down over the patient's head. This at no time revealed a swelling on the forehead. The reason

that no external evidence of head injury is recorded on the nurse's card is that nothing of the kind was found. Witness says that she would have been especially interested in an external evidence of trauma like a lump or bruise in view of the fact that petitioner did report a fall.

It is a fair inference that had petitioner at the time of his visit or visits to the nurse borne on his forehead over the right eye the sign of external injury said to have been noticed by his wife when he returned home, it would with reasonable certainty have been noticed by the trained and observing eye of the nurse, and that it would have been recorded by her as a result of the reported fall, just as the injury to the hand was recorded.

It must be remarked here that petitioner's testimony that he told the nurse he "had the head injury and the hand injury" and his wife's testimony concerning a lump on petitioner's forehead, viewed with the contrary testimony of the witness Garley, presents a factual issue within the compass of the testimony cited. It is one, however, that in the opinion of this court presents no difficulty. The factors which resolve this issue are the disparity between the interest on the one side and the disinterest on the other; the corroboration of the Garley testimony that inheres in the particularity and circumstance attending her dealings with petitioner, such as the duty attaching to her to ascertain and record reported or observable injuries, the setting of herself to make written memoranda of details, the absence from such memoranda of the details here in question, the undisputed fact that she treated all injuries other than that in question, plus the admitted fact that there was no treatment of the one here in question; the fact that her testimony of petitioner's failure to report a head injury or to exhibit external evidence thereof is corroborated by petitioner's like failure in numerous other instances, the testimony of his failure in all such instances being in nowise contradicted by petitioner, nor by his wife when the latter was in position to do so if she could. There is thus disposed of the only testimonial conflict which the record presents.

Counsel endeavors to impair the effect of the Garley testimony by quoting from it that she "could not remember every detail of over two years." These words occur in an answer elicited by a series of questions concerned with whether she was relying on her memory or on the written record. The answer in full is: "I am relying mostly on the record. I cannot remember every detail of over two years ago, sir. I don't believe anybody can, minute details, anyway." And equivocation is imputed to the witness' response that she did "not recall." Wherever such responses occur they are preceded by unequivocally negative answers on the point involved. Changes like this in the form of answer, brought about by mere stress of repetition in the questioning, do not have the character to change the meaning of testimony or lessen its weight.

Following his alleged fall, petitioner, as already mentioned, completed his 4 to 12 shift on that day and worked in addition four hours overtime. It was during the late afternoon of the day following, while riding in a bus from Jersey City to respondent's plant, that he experienced the onset of paralysis. Upon his arrival at the plant the first person to see him and observe his condition was the witness Simonetti, petitioner's foreman. There appears to be no reason to doubt Simonetti's complete disinterest. On the date of the hearing he was no longer in respondent's employ, and he had refused to testify voluntarily in the case, as the evidence shows. Process of subpœna was required to bring him into court. Concerning the events of the 18th, the day following the accident, this witness says that petitioner reported for work a little late. He noticed that his eyes were glazed and that he had difficulty in speaking. Witness thought petitioner was under the influence of liquor and smelled the latter's breath to resolve his doubt. The result being negative, he pressed petitioner to explain his difficulty. The witness was then made to realize that petitioner was finding it difficult to move his arm and fingers. "So," as the witness states it, "between the condition of his hand and the look on his face I thought there was something seriously wrong with him, so I escorted him over to the first aid and that was the last I seen of him

that night." The testimony of this witness is especially important for what it tells of his experience with petitioner on the prior afternoon of January 17th, immediately following the reported fall and petitioner's consequent visit to the nurse. Petitioner reported late and the witness asked him where he had been, receiving the response that he (petitioner) had been to the first aid because he had fallen on the way into the shipyard, explaining further that he had stopped for treatment on the way to his work and that he had also been treated at the first aid for a flash. He told the witness that he had fallen "on his hand," and his hand was bandaged; also advising the witness that he had to go back to the first aid that night for further flash treatments every three hours. The witness does not recall any statement by petitioner in his account of the fall that he had injured any part of his body except his hand, and he does not think that any such statement was made. He noticed nothing wrong with petitioner except for the bandage on his right hand.

In the appraisal of Simonetti's testimony there are three definite ponderables that favor credence. The first is the man's palpable freedom from bias. The second is his inquiring frame of mind on both occasions when petitioner's state concerned him. He was apprehensive; he looked for a reason for petitioner's conduct and demeanor. He observed nothing unusual about petitioner's forehead, notwithstanding it was (on the afternoon of the 18th), "the look on his face" that made the witness think "there was something seriously wrong with him." Why would he not notice the lump on the forehead if it were there? If petitioner's wife noticed it, why didn't Simonetti notice it also, under what would appear to be more conducive circumstances? The third consideration prompting belief in the truth and accuracy of this testimony is the fact that it remains uncontradicted.

On January 18th, following the paralysis and after the witness Simonetti had brought petitioner to the first aid station, the first physician to see petitioner was Dr. Obester. It was to him that the patient was referred by the nurse already mentioned. The doctor saw him between 5 and 7 p. m. A card record was made at the time in the doctor's

handwriting. Petitioner then complained of weakness of right side and right hand. Dr. Obester made a physical examination and noted his findings on the card. These were a flattening out of the right side of the face, speech impediment (with a notation of witness' comment that "this just came on suddenly"), lip lag on right side. The doctor recorded also his own suspicion of cerebral involvement. He suggested immediate transfer to a hospital because of his belief that a cerebral hemorrhage was impending. Dr. Obester's examination of petitioner included also the latter's eyes. No abnormal condition in or about the eyes was found. If so, it would have been noted on the card. All objective findings were recorded. There was no evidence of injury to the head and no swelling found on the forehead. Such a condition would have been noted on the card and the patient treated accordingly. Moreover, the witness says evidence of that kind would have been regarded as very important, being indicative of head injury. The only history given by petitioner to the witness was that he fell and hurt his hand. Dr. Obester further testifies that where, as here, there is a lip lag, it is his usual course to determine, if possible, whether the patient has had a head injury. Upon cross-examination petitioner's counsel made particular effort to induce from Dr. Obester the concession that what the doctor had testified about his making special inquiry of defendant concerning a head injury was mere matter of assumption. This brought the following response: "I know I asked him because that is my usual procedure and has been since medical school. Ever since I left the Navy. I interned in the Navy three years and we were always taught to ask that." Thereupon the witness amplified his testimony by giving the reasons why he asked petitioner about head injury in a case of apparent cerebral involvement. The witness explained further that in the term head injury he specifically includes injury to the forehead, injury that could have caused a swelling over the right eye; that he did not confine his examination of the head to areas surrounding the eye but that he examined the entire head. The testimony of Dr. Obester remains uncontradicted.

On November 25th, 1944, there being still no claim pending, petitioner was examined by Dr. Christopher C. Beling, a neuropsychiatrist of forty-four years experience in that specialty. Acting jointly with Dr. Beling in the examination was Dr. Kinley, also a specialist. These physicians examined petitioner at the instance of respondent in order to ascertain the nature and extent of the disability. Petitioner's wife was present throughout. History and background were taken as part of the examination. Petitioner told these doctors, as he had previously told Simonetti and the others, that he had been knocked down at the yard by the men coming off duty while he was reporting for duty; that he fell on his right arm and hand and sustained superficial abrasions. He told them further that the next day his right hand was dead; that he reported to the plant nurse and was thereafter taken to St. Francis Hospital at Jersey City where he remained for about three months. It is the testimony of Dr. Beling that petitioner said nothing about a head injury "as far as I can recall." The doctor adds that such a detail would have been matter of importance; that he would "naturally" have been interested to know whether petitioner had a head injury or not. He says that he got no history like that of any injury to the forehead resulting in a swelling; that petitioner said nothing about a swelling over the right eye and neither did petitioner's wife. The witness would have written down any mention of other injury besides the abrasion on the hand. Specifically the doctor testified, "In every case I ask them sufficient questions to elicit head injuries." In all respects this testimony remains uncontradicted.

In the course of his testimony on the point now considered occurs the statement by Dr. Beling that "It is a well known fact that patients generally speak of the things that hurt them most at the time." In petitioner's brief effort is made to exaggerate the effect of this. We have no means of knowing what, if anything, did hurt petitioner most at the time of the doctor's interview and examination on November 25th, 1944. Such description as there is of petitioner's pains is confined to January 17th and 18th, ten months earlier, and at that it is very general. In spite of what counsel urges,

it is not possible to regard the statement of Dr. Beling as anything more than medical *obiter dictum.*

On his cross-examination Dr. Beling was confronted with some texts published years ago under his authorship. It was disclosed to have been the doctor's view, at least at the time of the writings in question, that a head trauma, no more than slight, might be sufficient to cause brain injury. No such inquiry is presently relevant. It is not the contemplation of any head injury at all, however conjectured and however slight, that will aid in solving our problem. It must be an injury recognizable as that whose external evidence petitioner and his wife describe.

In one or more important respects it is necessary that Dr. Beling's testimony be read and considered with that of Dr. Kinley, the two having interviewed and examined petitioner together. By way of criticism of the Beling testimony it is argued for petitioner: "Why was Dr. Beling testifying from memory? * * * He should have had his records complete and in court." We presume this reference is to the memorandum of the examination and interview made at the time. The fact is that such memorandum was made not by Dr. Beling but by Dr. Kinley, and that it was placed at counsel's disposal and used by him in Dr. Kinley's cross-examination. Dr. Kinley corroborates Dr. Beling in all respects and provides some additional detail. He testifies that the history was given by both petitioner and petitioner's wife. In the history petitioner describes his work and mentions spark burns of the first and second fingers of both hands that occurred to him in April, 1943. And the doctor's record shows that petitioner ascribed to these burns some relationship with his paralysis. The witness says further that it was a significant feature of the history that it contained no mention of head injury. Petitioner by way of describing the accident told the two doctors that on January 17th, 1944, he was knocked down and fell on his right hand and arm. There was no mention made by petitioner or his wife of either a head injury or a swelling. Witness says he is as positive of this as he "can reasonably be;" that he does not have it in his notes and does not recall having heard it, and that he

would have certainly have it in his notes had it been mentioned. He states that at the time of the examination he was naturally concerned with the question of head injury. Dr. Kinley's card record was made contemporaneously with the examination, and his testimony remains uncontradicted by petitioner and by his wife.

Upon his admission to the hospital petitioner was the patient of Dr. Brozdowski, then medical director of respondent company. It was Dr. Brozdowski who took from petitioner the history of the case at the hospital. The history given was that of a fall and an injury to the right hand with gradual loss of sensation in the right arm beginning on the evening following the fall. Petitioner did not tell the witness of an injury to the head. Examination made by the witness revealed no evidence of trauma or head injury. Dr. Brozdowski was especially interested in the matter of head injury because upon the presence or absence of such injury depended whether the patient would remain on his service at the hospital or be transferred to the medical service under the charge of Dr. Herradora. It was for the very reason that there was no history or evidence of head injury that the patient was transferred as stated. Witness says he did not ask the patient specifically whether he struck his head, because there was no indication of head injury. Petitioner did, however, mention the injury to his right hand. The witness says that as a physician he had no suspicion of a traumatic cause of the condition. In the giving of his testimony Dr. Brozdowski relies entirely on the record, which was made and kept in the manner he describes at length. The testimony of Dr. Brozdowski remains uncontradicted.

Petitioner placed in evidence as part of his case the complete hospital record covering the entire period of petitioner's stay. This record is voluminous. It contains a running day to day record and a series of histories given by petitioner from time to time to different physicians. On cross-examination Dr. Stockfisch, petitioner's expert, was confronted with this record and from him the admission was elicited that it contains no history of swelling on any part of the patient's head or face, nor of any head trauma, though it contains his-

tories taken from petitioner on different occasions by Dr. Mudroch and Dr. Sokal.

With further reference to the hospital record, counsel seeks to weaken its prestige by pointing out alleged omissions. He says, for example, that it contains no mention of a bandage on the right hand nor of the flash conjunctivitis. There is no evidence that either of these things existed at any time covered by the record and positive evidence that they did not.

Petitioner's counsel charges respondent with failure to call Dr. Herradora, to whose service at the hospital the patient was transferred, as already stated, from that of Dr. Brozdowski. It must be remembered that the definitive hospital record was placed in evidence by petitioner, including as it does the recorded case of petitioner as Dr. Herradora's patient. Why then is it that respondent should have called Dr. Herradora? If in this regard petitioner has in mind the eliciting from the doctor of testimony relative to causal relation, it need only be said that all technical inquiry of that kind has been resolved, as already shown, into the factual question of the happening of head trauma in the accident. If, on the other hand, petitioner has in mind the eliciting from Dr. Herradora of testimony having to do with a history of head trauma, it need only be said that the hospital record, as introduced by petitioner, speaks for itself.

Moreover, Dr. Herradora was not respondent's physician or witness, and the burden of proof is not upon respondent. It is argued for petitioner that "Dr. Herradora's testimony would obviously have damaged the appellant's case." That would be an excellent reason for his being called by petitioner.

Respondent, on the other hand, charges petitioner with the failure to call Dr. Philip Smith of New York City, who, from the time of petitioner's hospital discharge (April, 1944, nearly a year before the filing of the claim), until and including the time of the hearing, was petitioner's attending physician. Respondent's argument, in effect, is that very probably in the natural course of things Dr. Smith obtained from petitioner, preliminary to his care and treatment of him, a history of symptoms and events antecedent to the onset of the patient's condition, and that failure to call the doctor

under these circumstances induces an inference unfavorable to petitioner on the present issue. *Nelson* v. *Public Service Corp.* (*Supreme Court*), 5 *N. J. Mis. R.* 73; 135 *Atl. Rep.* 467; *State* v. *Codington*, 80 *N. J. L.* 496; 78 *Atl. Rep.* 743; *State* v. *Callahan*, 76 *N. J. L.* 426; 69 *Atl. Rep.* 957. The failure to call Dr. Smith cannot, in the opinion of this court, operate against petitioner without a showing that the doctor did actually obtain a history, and of that there is no evidence one way or the other. We are not permitted to assume that he did.

Another factor in the proof, under the principle first above set forth, is the failure of petitioner and his wife alike to include in the statement of facts made by them to petitioner's attorney, when the claim was prepared for filing, any reference to a head injury or evidence thereof. The claim petition was drawn, signed and sworn to on March 26th, 1945. Petitioner's wife was present with her husband in the attorney's office at the time and was with him when he told his attorney "the facts concerning the accident." She says that her husband read the contents of the claim petition and, having done so, signed it. If the head injury had been in the mind of either of them at the time it is inconceivable that they would have failed to mention it. The importance of a head injury renders their failure the more remarkable in view of the nature of the claim for a disability described as a "completely shattered nervous system" and the loss of the power of speech. The omission is remarkable also because of the specific reference in the claim petition to the "badly cut and bruised" right hand.

Counsel for petitioner appends to his brief a copy of letter written by him to respondent's counsel confirming a prior conversation with reference to a proposal by the former that the claim petition be amended to include an allegation of injury to the head. This letter is dated March 16th, 1946, two years and two months after the accident. Nine days later the hearing was begun and the claim petition was then amended in keeping with the import of the letter, on application in open court. The failure of both petitioner and his wife to tell counsel about a head injury, including also their

failure to tell him about the evidence thereof which the wife says she observed in the form of a lump, remains unexplained.

By the finding of this court on all the proofs submitted it is established that petitioner was continuously unmindful of having sustained a head injury for a period of two years lacking one month following the accident, and until December 16th, 1945, when he was examined on behalf of respondent by the psychoneurological specialist Dr. Grossman at his (petitioner's) home and in the presence of petitioner's attorney. To state it another way, throughout the period indicated the behavior of petitioner (and that of his wife, as well) concerning the present claim is seen to be in perfect consonance with the non-existence of head trauma at all times.

The terminal limit of the period aforementioned is fixed as the date of Dr. Grossman's examination because it is inferable that as of that date there emerged for the first time an awareness on petitioner's side that there was inflicted by the accident, in addition to the abrasions of the hand, an injury to the head. The inference arises from the effort of petitioner's counsel to show on his cross-examination of Dr. Grossman the history given the doctor when petitioner was examined by him in counsel's presence, as already mentioned. Upon objection the inquiry was forbidden, and in petitioner's brief respondent's counsel is taken to task for failing to elicit from its examining doctor the history given him on this particular occasion. With the propriety of the objection itself and the ruling thereon no fault is found; but aside from the technical correctness of the exclusion this court is free to assume for present purposes that in the history obtained by Dr. Grossman a head injury was mentioned, and if so, to observe that it is the first and only time such mention appears throughout the entire period following the accident nearly two years before.

As already stated, Dr. Grossman's examination was made on December 16th, 1945, and when petitioner's negating silence ended on that occasion—and still pursuing the inference that it did—petitioner's medical hypothesis of causal relation, with its inclusion of head trauma as a basic factor, had then already been formulated. The only psychoneuro-

logical specialist testifying for petitioner made his examination of the patient some two weeks prior. The inclusion of head trauma in any history given in the course of Dr. Grossman's examination but emphasizes its omission from all that had gone before.

Counsel argues that petitioner's speech impairment should be taken as explaining the omissions thus far dealt with, and the deputy commissioner makes a similar observation in the determination below, basing it on petitioner's manner of testifying before him. It is not to be supposed that counsel will deny that sometime prior to the hearing petitioner did tell him of a head injury, with consequent amendment of the claim petition, though probably at such a time as to be ineffectual under all the facts and circumstances of the case. Nor can it be denied that on all occasions petitioner was well able to tell about his hand injury. Why then was he not equally able on some of these occasions at least to tell also of a head injury? It certainly does not appear from the hospital record that the patient experienced difficulty in telling the doctors all that he had it in mind to tell them about his fall and the injury sustained. If he was able to tell all that the hospital record shows, what is the reason for his failure to include in it mention of an injury to his head?

Furthermore, petitioner's speech defect does not in the least explain the joint failure of himself and wife to give to Drs. Beling and Kinley the full history that is now so vital to the medical theory of the claim; and it does not explain the wife's failure in the first instance to give it to the attorney at the time the claim petition was drawn. Whatever excuses one might wish to make on the score of speech impairment, to what are we to ascribe the persistent failure of the lump, the outward evidence of crucial injury, to manifest itself to all disinterested persons who should have and could have seen it were it there?

All authorities cited in petitioner's brief have been carefully examined and are found not to apply to the present situation. The attention of this court is directed, for one thing, to that class of workmen's compensation decisions that turn on a *post-hoc-ergo-propter-hoc* principle and derive a

reasonable sanction from what some of them speak of as "the common experience of mankind." *e. g. Cavanagh* v. *Murphy Varnish Co.,* 130 *N. J. L.* 107; 31 *Atl. Rep.* (*2d*) 759; *Sorge* v. *D. R. Clothing Co.* (*Supreme Court,* No. 216, May term, 1945, not reported). This case belongs in no such category. To hold otherwise the court would have to say that the time relation here between the claimed accident and the experience of petitioner while on his way to the plant the following day was such as to integrate the disability with the accident and to establish *ipso facto* causal relation between the two, from which holding it would necessarily follow that the matter of head trauma, with the external evidence thereof, can be of no consequence to the issue; notwithstanding the fact that trauma, and therefore its external evidence, according to petitioner's own experts, is a prerequisite to the establishment of the claim medically. Petitioner's Dr. Stockfisch says that apart from an hypothesis of head trauma he would have to look for "some other cause" of the disability; and petitioner's Dr. Meehan testified that it is "essentially correct" to say that causal relation in the case is predicated on the truth of what the hypothesis assumes.

Certainly it is not any and every accident that could account for claimant's condition. Petitioner's experts admit as much, as we have just seen. And the question of what happened to petitioner in the accident *sub judice* is the nub of the controversy. To deal with the problem otherwise is unavoidably to beg the question, as for example when the deputy commissioner says in his findings of fact: "\* \* \* there has been no convincing evidence presented to show the cause for this disability outside of trauma." Outside of what trauma? Whether or not there was trauma of a kind capable of causing the disability was the question that awaited decision. The quoted excerpt from the deputy commissioner's findings indicates either a decision of the case upon a begging of the question or a mitigating of petitioner's burden of showing affirmatively that the disability was caused by the accident.

In the light of the rule of evidence set forth at the outset the proofs adduced by respondent so completely countervail

those of petitioner that this court cannot say, more especially in the total absence of rebuttal where rebuttal in the way of extenuation or denial is so loudly called for, that petitioner's required burden has been carried. *Carr* v. *Federal Shipbuilding Co.,* 133 *N. J. L.* 564; 45 *Atl. Rep.* (*2d*) 597.

The claim petition is dismissed.